**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DANIEL BEFFA, JR.,**

       **Plaintiff,**

**vs.**                              **Case No. 4:08cv437-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be **AFFIRMED** with respect to the determination of Plaintiff's residual functional capacity, but **REVERSED and REMANDED** solely to obtain vocational evidence.

**Procedural status of the case**

Plaintiff, Daniel Beffa, Jr., applied for disability insurance benefits. His last date of insured status for disability benefits is December 31, 2009. Plaintiff was 54 years old

at the time of the administrative hearing (on March 21, 2007), has a 12th grade

education with technical school training in aviation maintenance and technology, and

has past relevant work as manager of a marine electric company and a marine

electrician working in the engine room of ships.  Plaintiff alleges disability due to

emphysema, chronic obstructive pulmonary disease, sleep apnea, low back pain from

herniated discs, and right knee degenerative joint disease, with an onset on August 1,

2004.

The Administrative Law Judge found that Plaintiff has the severe impairments of

chronic obstructive pulmonary disease with a history of heavy smoking, sleep apnea,

chronic back pain with a history of herniated discs and radicular pain to the right lower

extremity, right knee degenerative joint disease, and obesity.  R. 20.  He determined

that none of these met or equaled a Listed impairment.  R. 22.  He determined that

Plaintiff had the residual functional capacity to do a limited range of light work.  *Id*.

Relying upon the "grids,"[1] the ALJ found that Plaintiff was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at:
http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

    The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  <u>Chester</u>, 792 F.2d at 131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  <u>Hale v.</u>

<u>Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[2]

Plaintiff testified at the administrative hearing that toward the end of his work, he noticed that he had more trouble breathing with stress and exertion. R. 446. He sold his marine electrical business in August, 2004. *Id.* He said he was told by his physician that he had emphysema. *Id.*

Plaintiff said that he experienced shortness of breath "brought on mainly by stress." R. 447. He quit smoking cigarettes in 2004. *Id.* He said he still smoked a cigar once a month. *Id.* He said that he did not have enough lung capacity, and if he tried to pick up something heavy, he would "pass out." *Id.*

Plaintiff said that on a humid day, he cannot walk at all, that he gasps for breath. R. 448. If the humidity is low and it is cooler, he said he can walk ten to fifteen minutes, depending on his knee. *Id.* Smoke, he said, makes breathing worse. *Id.* Plaintiff said he used an inhaler, Combivent,[3] for breathing problems. R. 449.

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link). Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[3] Combivent is prescribed for people with chronic obstructive pulmonary disease (COPD) if they are already taking one airway-opening medication and need another. The product's two active ingredients act in distinctly different ways. Ipratropium quells airway-closing spasms in the bronchial walls. Albuterol relaxes the muscles in the walls, permitting them to expand. When used together, the two ingredients provide more relief than either can do alone. Combivent is supplied in an aerosol canister for use only with the special Combivent mouthpiece. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said his knee was "real messed up."  R. 450.  He said that he had had arthroscopic surgery, and his knee now grinds, pops, locks, and has jabbing pains.  *Id.* He said he experiences pain with bending, turning, walking, or twisting.  *Id.*  He said that he needs a knee replacement.  *Id.*  He takes Advil for the pain and Valium to relax the muscles of his back.  R. 451.  He also takes Oxycodone[4] for pain, but said that it puts him "on cloud nine."  *Id.*  It made him dizzy, anxious, and impaired his memory.  *Id.*  He said he takes Oxycodone three or four times a month.  *Id.*

Plaintiff said that he had disc problems in his lower back.  R. 452.  He said that in a six month period, on three or four occasions it would be severe enough to put him "down for the count" for two weeks.  *Id.*  It is on those occasions he uses the Oxycodone and Valium.  *Id.*

Plaintiff said that during the day, he watches television.  R. 454.  He spends 20 minutes on the couch and 20 to 30 minutes in a rigid chair, and then back to the couch. *Id.*  He said he mows the lawn with a riding mower, taking it slow and using a mask for dust.  *Id.*  He sometimes makes breakfast, but his wife did most of the household chores and shops for groceries.  R. 455.  He said he could remain seated driving a car for 15 to 20 minutes.  *Id.*  He is able to take care of his personal hygiene and dress himself.  R. 456.

Plaintiff said that pain was his primary problem when he tried to sleep, though he sometimes had problems breathing.  R. 456.  He takes a nap of for 20 to 45 minutes a couple of times a day.  *Id.*  He tried to walk in his yard for exercise.  R. 463.

---

[4] Oxycodone, a narcotic analgesic, is used for its calming effect and for pain and is one of the two ingredients in Percocet.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff owns two town homes which he rents.  R. 459.  He also has a 51 acre long leaf pine tree farm.  R. 459-460.  There is no current income from the tree farm.  R. 460.  There tree farm required very little maintenance (only cutting fire lines).  *Id.*

**Analysis**

### Whether the ALJ erred in rejecting the opinions of treating physician Dr. Sultan and consultative physician Dr. Stein

On October 19, 2005, Craig G. Sultan, M.D., an osteopath, filled out a "Multiple Impairment Questionnaire."  R. 313.  He said he first treated Plaintiff in 2003, and his most recent examination was on August 21, 2004.  *Id.*  Dr. Sultan's diagnosis was herniated disc, COPD (chronic obstructive pulmonary disease), and chronic right knee pain.  *Id.*  He said that Plaintiff's prognosis was poor.  *Id.*  When asked to identify the positive clinical findings to support the diagnosis, he wrote:  failed pulmonary function test (see report) and an MRI of the back shows a herniated disc.  *Id.*  He said that Plaintiff had fatigue, depression, chronic wheezes, severe back and knee pain, and limited range of motion in the knees.  R. 314.  He said that Plaintiff's pain was severe, constant, and sharp.  *Id.*  He said that Plaintiff's pain was caused by motion, prolonged sitting, and prolonged standing.  R. 315.  He rated Plaintiff's pain 8 on a scale of 10, and his fatigue at 9 on a scale of 10.  *Id.*  He thought that Plaintiff could not sit or stand for more than one hour in a competitive eight hour, five day, work environment, and must constantly move.  *Id.*  He thought that Plaintiff could only occasionally lift or carry up to 10 pounds.  R. 316.  He said that Plaintiff's ability to grasp or twist objects with either hand, to use his hands and fingers in fine manipulations, and to use his arms to reach, was markedly impaired.  *Id.* and R. 317.  He said that physical therapy had failed.  R.

317.  He said that Plaintiff's symptoms would likely increase if he worked in a

competitive environment and would interfere with his ability to keep his neck in a

constant position.  *Id.*  He said that Plaintiff's pain would constantly interfere with his

attention and concentration.  R. 318.  He said that Plaintiff was not a malingerer and

was incapable of tolerating even low stress.  *Id.*  Dr. Sultan concluded that Plaintiff

"cannot work."  R. 319.

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.  "The Secretary

must specify what weight is given to a treating physician's opinion and any reason for

giving it no weight, and failure to do so is reversible error." <u>MacGregor v. Bowen</u>, 786

F.2d 1050, 1053 (11th Cir. 1986). This circuit finds good cause to afford less weight to

the opinion of a treating physician "when the: (1) treating physician's opinion is not

bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating

physician's opinion was conclusory or inconsistent with the doctor's own medical

records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-1241(11th Cir. 2004); <u>Edwards v.</u>

<u>Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be

discounted when it is not accompanied by objective medical evidence or is wholly

conclusory."). *See also*, <u>Crawford v. Commissioner Of Social Security</u>, 363 F.3d 1155,

1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the

treating physician's opinion).

The ALJ did not give substantial weight to the opinion of Dr. Sultan, reasoning:

> Dr. Sultan's progress notes reflects routine outpatient care, and there were
> no specific limitations or restrictions given regarding the claimant's
> physical abilities. A fair reading of his care reflects nonspecific treatment
> in the nature of check-ups with referrals to other doctors and prescription
> medications for the claimant's symptoms. Dr. Sultan's opinion is not well
> supported by objective medical findings of record and appears based
> heavily upon self-reports by Mr. Beffa . . . .

R. 25.

Dr. Sultan's medical notes are essentially illegible. It is gleaned from the portion

that can be deciphered that he treated Plaintiff for bronchitis on September 12, 2003,

May 11, 2004, May 26, 2004, September 21, 2004, December 29, 2005, January 5,

2006. R. 244, 278-279, 276-277, 243, 241, 240. No impairments other than bronchitis

were noted on those occasions. Dr. Sultan saw Plaintiff on October 11, 2006 (R. 403),

October 17, 2006 (R. 398), December 4, 2006 (R. 394), June 18, 2007 (R. 434), and

March 20, 2008 (R. 432), but did not enter a diagnosis of any impairments or note any other impairments on those dates.  Indeed, he seems to have found that Plaintiff's respiratory system was clear on October 17, 2006 (R. 398), December 4, 2006 (R. 394), June 18, 2007 (R. 434), and March 20, 2008 (R. 432), though he noted COPD on December 29, 2005 (R. 241) and March 24, 2008 (R. 432).  Consequently, the ALJ was correct that Dr. Sultan's medical records do not support his opinion.

Plaintiff argues alternatively that Dr. Sultan's opinion is supported by the "reports of those specialists to whom Dr. Sultan referred" Plaintiff.  Doc. 13, p. 12.  This argument is not persuasive.

Plaintiff was examined by Afzal H. Khan, M.D., on a consultative basis on June 30, 2005, and was found to have no edema, and normal range of motion in his back, neck, hips, and knees, with no joint swelling.  R. 307.  This is not evidence to support Dr. Sultan's opinion.

On December 13, 2006, Plaintiff was referred by Dr. Sultan to Richard J. Simon, M.D., for an orthopedic evaluation of pain in Plaintiff's right knee.  R. 382.  Dr. Sultan did not refer Plaintiff to Dr. Simon for evaluation of cervical or lumbar back pain, which is telling.  Dr. Simon found pain in Plaintiff's right knee upon examination.  R. 383.  He noted from an MRI of the right knee that the image was "positive for full-thickness chondral loss of the medical compartment, likely recurrent medical meniscus tear of the remnant and a PCL ganglion cyst."  *Id.*  The impression was "Right knee DJD," with a likely recurrent medical meniscus tear.  *Id.*  Plaintiff was given an injection of Depo-Medrol.  *Id.*  Dr. Simon discussed the possibility of arthroscopic debridement of the knee, "which cannot promise him any relief," and possible knee replacement.  *Id.*

Except for the right knee impairment, this encounter with Dr. Simon does little to support Dr. Sultan's opinion.

On January 4, 2005, Plaintiff was seen by Glenn R. Singer, M.D., a pulmonary and sleep specialist. R. 339. Dr. Singer observed that Plaintiff had quit smoking a year earlier after "75 pack years." *Id.* Dr. Singer noted no history of depression or heart disease. R. 340. He found the sounds of Plaintiff's breathing to be "pretty clear today with normal expiratory phase." *Id.* Dr. Singer's impression was COPD (chronic obstructive pulmonary disease). *Id.* Dr. Singer said:

> The patient says he was diagnosed with emphysema but the CAT scan
> and chest x-ray do not support that. I wonder if he really didn't have more
> chronic bronchitis.

R. 340. Sleep apnea was also suspected due to history and "body habitus." *Id.* A pulmonary function test was ordered. R. 341. The pathology of sleep apnea was discussed with Plaintiff, especially the importance of not driving motor vehicles if sleepy. *Id.* The only limitation recommended was not driving motor vehicles or machinery if experiencing daytime sleepiness. *Id.*

On January 19, 2005, Plaintiff was tested for sleep apnea. R. 342. The impression was "[s]evere daytime sleepiness and history of snoring, now with severe obstructive and central apnea." *Id.* A "CPAP[5] titration study" was recommended. *Id.*

---

[5] People with obstructive sleep apnea, particularly those who have excessive daytime sleepiness, benefit most predictably from continuous positive airway pressure (CPAP). With CPAP, people breathe through a face or nose mask that provides a slightly higher pressure in the airway. This increased pressure props the throat open as the person breathes in. CPAP can be given with or without humidifying the delivered air. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On February 3, 2005, Plaintiff's lung capacity after testing was found by Glenn R. Singer, M.D., to be normal.  R. 337.  Dr. Singer disagreed with a diagnosis of emphysema.  R. 337.  Dr. Singer also said that when Plaintiff asked him:

> about his shortness of breath I said that his body mass index is 29 which meets the criteria for obesity.  He continues to smoke even if it is cigars.  The carboxyhemoglobin reveals that he is clearly inhaling.  He needs to lose weight and begin aerobic exercise three or four times per week.

R. 337.  In summary, these findings clearly do not support Dr. Sultan's opinion.  The only limitation suggested for daytime sleepiness from sleep apnea was not to drive a motor vehicle or heavy machinery.  Dr. Singer found that Plaintiff does not have emphysema and suggests that Plaintiff's breathing problems are due to his weight and lack of conditioning.

On June 30, 2005, Dr. Khan said that X-rays of Plaintiff's chest show "[c]hanges consistent with chronic obstructive pulmonary disease."  R. 307.  Dr. Khan also found that Plaintiff's respirations were 15 and *unlabored*.  R. 306 (emphasis added).  These findings likewise indicate that Plaintiff's breathing was not labored, despite having COPD, and do not support Dr. Sultan's opinion.

In summary, Dr. Sultan's opinion is conclusory, unsupported by his treatment notes, and is not supported by other objective medical evidence in the record.  The ALJ's rejection of Dr. Sultan's opinion correctly follows the law and his reasons fro reject Dr. Sultan's opinion are supported by substantial evidence in the record.

Alvin Stein, M.D., examined Plaintiff on a consultative basis on August 22, 2006.  R. 353.  Dr. Stein is an orthopedic specialist.  *Id.*  Prior to his physical examination of Plaintiff, Dr. Stein said that Plaintiff came in "with severe pain in his back radiating down

into his buttocks and legs, also pain in both hands and arms, and also pain in his right knee." *Id.* Dr. Stein said that Plaintiff had tried several forms of treatment, "none of which helped." *Id.* Dr. Stein said that Plaintiff was currently suffering from emphysema "and suffering with shortness of breath even on minor exertion and indeed sitting in the office he has shortness of breath even after trying to carry out an aggressive conversation." *Id.* Dr. Stein said that Plaintiff had difficulty sitting in a chair for more than a few minutes, constantly getting up and down, but unable to find a comfortable position. *Id.* Dr. Stein listed Plaintiff's medications and said that they "just barely help him." R. 354. He said: "If he takes a walk out for 30 or 40 feet, he has to stop because he gets short of breath." *Id.* After his physical examination of Plaintiff, Dr. Stein said that "[p]alpation of the neck reveals exquisite pain and tenderness mid cervical region." R. 354. He found that he had limited motion in his neck, having to stop motion in several directions due to pain. *Id.* Dr. Stein found that Plaintiff had "good strength, shoulder shrugging, abduction, elevation, internal and external rotation of his shoulders and elbows and hands and wrists." *Id.* He found some decreased sensation in the median nerve distribution at C5 and C6. *Id.* Dr. Stein noted a diagnosis of carpal tunnel syndrome, but said that this diagnosis "does not appear to be the clinical picture from my point of view." *Id.* Dr. Stein found Plaintiff to have "exquisite tenderness over the symphysis pubis midline lower abdomen." *Id.* Dr. Stein noted:

> Lower extremity examination reveals marked weakness adduction of the hips against resistence. He has marked weakness on hip flexion because of back pain. He has reasonable strength on hip abduction. Internal and external rotational are okay. Straight leg raising out to 70 degrees before he runs into hamstring tightness, can go to 90 degrees with good strength in the rest of the lower extremities. There is no sensory loss there.

R. 354. Dr. Stein found "the most incredible amount of pain at L3-L4 and then L4-L5 in the lumbar area plus pain and tenderness over both sacroiliacs, left seems to be worse than right." *Id.* Dr. Stein said that Plaintiff presented with:

> numerous problems associated with a long history of toxins affecting his body. The gasoline that he puts his hands into to clean off grease from his working with the generators and the other machinery on the boats adds toluene and benzene to his body. The cigarette smoke, which he had for a long period of time and his still somewhat occasional cigar smoking have also leveled major toxins in his body. I think that these have a great responsibility for the cardiovascular symptoms and for emphysema.

R. 354-355. Dr. Stein said that Plaintiff had "severe lumbar instability, sacroiliac instability and symphysis pubis instability, all of which could attribute to his lower back pain and leg pain and weakness." R. 355. Dr. Stein concluded that the prognosis was:

> extremely poor for any kind of recovery back to gainful appointment and the patient surely is not able to work right now nor in the foreseeable future. He is surely justifiably entitled to social security disability award.

R. 355. Among the diagnoses listed by Dr. Stein that are legible are: fibromyalgia, cervical disc instability, disc degeneration, and right knee problems. R. 356. Dr. Stein thought that Plaintiff could not sit, or stand, or walk for more than one hour in an eight hour day, could not sit or stand or walk continuously in a work setting, could only lift or carry up to 10 pounds occasionally, and that all of Plaintiff's days were bad. R. 359-361.

The Administrative Law Judge rejected Dr. Stein's opinion. He wrote:

> Dr. Stein's opinion is not well supported by objective medical findings and is inconsistent with other substantial evidence of record. He only examined the claimant once, and his assessment appears to be heavily based upon self-reports of Mr. Beffa and subjective allegations of pain. The undersigned notes that Dr. Stein is frequently used by the firm of Mr. Beffa's attorney to provide a report and residual functional capacity

assessment on a one-time visit that virtually <u>always</u> reports the claimant as almost bedridden.  The actions of this doctor should be referred to the Florida Board of Professional Regulations and the Office of the Inspector General for investigation.  Base on the foregoing, the undersigned finds that there are specific and legitimate reasons to reject Dr. Stein's unreasonably restrictive assessment.  Therefore, the undersigned gives no weight to his opinion (<u>Social Security Ruling</u> 96-6p).

R. 25-26.

The rejection of Dr. Stein's opinion is supported by substantial evidence in the record.  A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. <u>McSwain v. Bowen</u>, 814 F.2d 617, 619 (11th Cir. 1987).  Dr. Stein said that Plaintiff cannot sit, or stand, or walk for more than one hour in an eight hour day.  R. 359. Plaintiff contradicted this.  Plaintiff himself said he sits all day watching television, moving every 20 minutes from the couch to a rigid chair.  R. 454.  Further, this record contains no objective findings of pain and limitations of movement noted by Dr. Stein from any treating source.  The usual case of impairment due to degenerative disc disease contains many objective clinical findings by the treating physician, but Dr. Sultan made none of those findings.  Plaintiff has pointed to no evidence in the record of a failure of treatment for back pain.  Dr. Stein's assumption that Plaintiff has emphysema is contradicted by a physician with expertise in that field, Dr. Singer. Finally, this record contains no evidence or diagnosis of fibromyalgia or impairment from toxins, and Dr. Stein's speculation in this respect is unsupported.  All of this is substantial evidence in the record justifying the rejection of Dr. Stein's opinion.  The court need not address the propriety of finding Dr. Stein to be lacking in credibility due to the ALJ's familiarity with Dr. Stein's testimony in previous social security cases.

### Whether the ALJ erred in the evaluation of Plaintiff's credibility

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

The Administrative Law Judge determined that Plaintiff's testimony as to the extent of his impairments was "not entirely credible." R. 24. He reasons that although Plaintiff's pulmonary problems cause a "major impairment," "he continues to smoke." *Id*. He noted that Plaintiff felt he was breathing better on Spiriva. *Id*. He noted that Dr. Singer found that Plaintiff had "normal spirometry and normal diffusing capacity," and disagreed with the diagnosis of emphysema. *Id*. He reasoned that Plaintiff had "managed to function with this condition for many years, including remaining capable of

mowing his lawn by using a mask," and that his breathing problems "have not been severe enough for him to stop smoking cigars." *Id.* He noted that Plaintiff continued to talk with the new owner of his business about technical matters of business, continued to hold the occupational license for his business in his own name, was certified for various kinds of electrical work, and held a private pilot's license. R. 25. He reasoned that Plaintiff does not need "around the clock assistance for daily living," and he functions quite independently. *Id.* He reasoned that Plaintiff's curtailment of activity was due to Plaintiff's preference, not disability. *Id.* Finally, he mentioned the objective medical evidence or, more properly, the lack thereof. *Id.*

All of these reasons are supported by substantial evidence in the record. Continuing to hold certifications and licensing, standing alone, does not necessarily detract from Plaintiff's testimony, but continuing to smoke cigars seriously detracts from Plaintiff's claim that he constantly suffers from shortage of breath. It is not that cessation of smoking would cure the alleged shortage of breath, or that Plaintiff only infrequently smokes cigars. It is also well-known that cessation of smoking is very difficult. But Dr. Singer found evidence that Plaintiff inhaled cigar smoke. A person who voluntarily pulls cigar smoke into his lungs, even if infrequently, may not be as seriously out of breath as alleged. Further, mowing a lawn on a riding mower may not seem like a strenuous exercise, but it can be depending upon the level of noise, vibration, bumpiness of the terrain, and the difficulty of manipulating the controls. But more important, Plaintiff's testimony is not supported by objective medical evidence, and the opinions of Drs. Sultan and Stein were properly rejected. The ALJ did not err in failing to credit Plaintiff's testimony.

**Residual functional capacity**

Consequently, the ALJ's determination of Plaintiff's residual functional capacity is supported by substantial evidence in the record. That residual functional capacity determination should be affirmed.

**Whether the ALJ erred in relying exclusively upon the grids at step 5**

The ALJ found that Plaintiff retained the residual functional capacity to supervise and direct skilled employees and manage a business. R. 27. He also found that Plaintiff has the residual functional capacity to perform a full range of light work except that he is limited to the occasional performance of postural activities (climbing, balancing, stooping, kneeling, crouching, and crawling), and must avoid exposure to fumes, odors, dust, gas, and poor ventilation. R. 22. He concluded that the grids may still be relied upon if the only limitations are these postural and environmental limitations. R. 28. Plaintiff contends that this was error because the ALJ did not rely upon vocational expert evidence, a labor treatise, or evidence of any kind to find that Plaintiff's limitations do not "significantly erode the base of light work." Doc. 13, p. 16.

The ALJ obtained testimony from a vocational expert. The ALJ determined, however, that the jobs identified by the vocational expert were unskilled sedentary jobs. R. 27. Since Plaintiff is highly skilled in electrical work and management of a company, the ALJ determined that there are no jobs identified by the expert as to which Plaintiff's skills could be transferred. *Id.* He thus did not rely upon the vocational evidence. *Id.*

Whether the ALJ then could rely upon the grids presents a complicated issue. Eighteen months ago, I concluded under similar circumstances that he could not. I concluded that despite the Social Security regulations governing this subject, this court

is bound by Marbury v. Sullivan, 957 F.2d 837 (11th Cir. 1992) and a remand is

required.  Maselli v. Astrue, 2008 WL 553615 (N.D. Fla. Feb 28, 2008) (No.

1:07cv00091-MP/WCS.  As I noted in the Maselli case:

> An ALJ has the obligation of developing a full and fair record regarding the
> vocational opportunities available to a claimant.  The ALJ must articulate
> specific jobs that the claimant is able to perform, and this finding must be
> supported by substantial evidence, not mere intuition or conjecture.  In
> appropriate circumstances, the grids may be used in lieu of vocational
> testimony.  However, " '[e]xclusive reliance on the grids is not appropriate
> either when the claimant is unable to perform a full range of work at a
> given residual functional level or when a claimant has a non-exertional
> impairment that significantly limits basic work skills.' "  Ordinarily, when
> non-exertional limitations are alleged, vocational testimony is used.  *See
> Cowart v. Schweiker*, 662 F.2d at 736; *see also MacGregor v. Bowen*, 786
> F.2d 1050, 1054 (11th Cir.1986) ("When there have been non-exertional
> factors (such as depression and medication side effects) alleged, the
> preferred method of demonstrating that the claimant can perform specific
> work is through the testimony of a vocational expert.").   "It is only when
> the claimant can clearly do *unlimited* types of light work,
> . . . that it is unnecessary to call a vocational expert to establish whether
> the claimant can perform work which exists in the national economy."

Allen v. Sullivan, 880 F.2d 1200, 1201-1202 (11th Cir. 1989) (most of the citations

omitted, emphasis added).

The "grids" may be used by the Commissioner "only when each variable on the

appropriate grid accurately describes the claimant's situation."  Walker v. Bowen, 826

F.2d 996, 1003 (11th Cir. 1987).  There are four variables:  age, education, past work

skills, and physical exertional requirements specified for the category of work

(sedentary, light, medium, and heavy).  Heckler v. Campbell, 461 U.S. 458, 461-462,

103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).  "Exclusive reliance on the grids is

appropriate in cases involving only exertional impairments (impairments which place

limits on an individual's ability to meet job strength requirements)." Foote v. Chater, 67

F.3d 1553, 1559 (11th Cir. 1995), *citing* Campbell.

As the court said in the Allen case quoted at length above, a distinction is made

between exertional and non-exertional limitations.

> Exclusive reliance on the grids is not appropriate either *when a claimant is unable to perform a full range of work at a given functional level* **or** *when a claimant has non-exertional impairments that significantly limit basic work skills.* . . . The grids also may not be used when the claimant's non-exertional impairments are severe enough to preclude a *wide range of employment at the level indicated by the exertional impairments.* . . . Non-exertional impairments include "postural and manipulative limitations, and must be considered in determining a claimant's residual functional capacity." 20 C.F.R. § 416.945(d).

Walker v. Bowen, 826 F.2d at 1002-1003 (emphasis added); Phillips v. Barnhart, 357

F.3d 1232, 1242 (11th Cir. 2004).

> Exertional limitations should be considered first.

> The first condition that requires the ALJ to consult a vocational expert is when the claimant's exertional limitations prevent the claimant from performing a full range of employment. *This Court has interpreted a "full range of employment" as being able to do 'unlimited' types of work at the given exertional level.*

Phillips v. Barnhart, 357 F.3d at 1242 (citations and footnote omitted, emphasis added).

"Exertional limitations affect an individual's ability to meet the seven strength demands

of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.*, n. 11

(citations omitted).

The second condition considers non-exertional limitations. Despite the name,

non-exertional limitations also include some exertional limitations. "Nonexertional

limitations or restrictions affect an individual's ability to meet the other demands of jobs

and include mental limitations, pain limitations, *and all physical limitations that are not*

*included in the seven strength demands.*"  Phillips v. Barnhart, 357 F.3d at 1242, n. 11

(citations omitted, emphasis added).  "When considering [a claimant's] nonexertional

limitations, the ALJ need only determine whether [the claimant's] nonexertional

impairments *significantly* limit her basic work skills."  *Id.*, 357 F.3d at 1243 (citations

omitted, emphasis added).  This means "limitations that prohibit a claimant from

performing 'a wide range' of work at a given work level."  *Id.*

The phrase "full range" of work, which applies to exertional impairments (the

seven strength categories) and the phrases "significantly limit her basic work skills," or

"limitations that prohibit a claimant from performing 'a wide range' of work at a given

work level," both of which apply to non-exertional impairments, seem to have been

equated in the case law.  For example, in Passopulos v. Sullivan, 976 F.2d 642 (11th

Cir. 1992), the court said:

> This court has recognized that the grids may be used in lieu of vocational
> testimony on specific jobs if none of the claimant's *nonexertional*
> impairments are so severe as to prevent a *full range* of employment at the
> designated level.

976 F.2d at 648 (citations omitted, emphasis added).  Passopulos said that the issue

was whether the claimant's nonexertional impairments would "erode" the claimant's

"ability to perform a *full range* of light work."  *Id.* (emphasis added).

In Marbury v. Sullivan, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the

claimant could do a "wide range of light work."  957 F.2d at 839.  He also found that the

claimant could not work around dangerous machinery or at unprotected heights.  *Id.*

The court held that a remand was required:

> Under the ALJ's findings it is evident that claimant was not able to do
> *unlimited* types of light work, because he was precluded from work around

unprotected heights or dangerous moving machinery.  Expert testimony
was therefore required to determine whether Marbury's limitations were
severe enough to preclude him from performing a wide range of light work.
An ALJ's conclusion that a claimant's limitations do not significantly
compromise his basic work skills or are not severe enough to preclude
him from performing a wide range of light work is not supported by
substantial evidence unless there is testimony from a vocational expert.  It
was therefore error to rely upon the grids.

*Id.* (emphasis by the court, citation omitted).

Here, the ALJ found that Plaintiff is limited to the occasional performance of

postural activities (climbing, balancing, stooping, kneeling, crouching, and crawling), and

must avoid exposure to fumes, odors, dust, gas, and poor ventilation.  R. 22.  The case

at bar, therefore, would seem to be indistinguishable from <u>Marbury v. Sullivan</u> and, by

force of that decision, a remand would required for additional vocational evidence.

Another helpful case is <u>Allen v. Sullivan</u>, *supra*.  There, the ALJ had found that

the claimant could *not* perform a "full range" of light work.  880 F.2d at 1202.  Significant

non-exertional impairments (dysthymic disorder, borderline mental retardation) were

found to exist.  *Id.*  The court determined that, given these findings, it was "clear that

appellant is not capable of performing *unlimited* types of light work."  *Id.*, (emphasis by

the court).  The court quoted <u>Ferguson v. Schweiker</u>, 641 F.2d 243, 248 (5th Cir. Unit A

1981), for the rule that:  "It is only when the claimant can clearly do *unlimited* types of

light work, . . . that it is unnecessary to call a vocational expert to establish whether the

claimant can perform work which exists in the national economy."  *Id.*

Defendant argues, however, that the non-exertional limitations identified by the

ALJ do not preclude a "full range" of light work, citing to Social Security Rulings.  Doc.

16, pp. 8-9.  The Commissioner has concluded in Social Security Rulings that an

inability to climb ladders, balance on slippery or moving surfaces, crawl, kneel, crouch, or stoop more than occasionally is not required in most sedentary or light exertional jobs. SSR 83-14 (inability to ascend scaffolding or crawl does not affect most light work); SSR 85-15 (inability to climb and balance, crawling, or kneel, not required in most light work); SSR 95-9p ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").

Likewise, the limitation that Plaintiff avoid hazards, such as machinery or heights, due to the risk of fainting, has been ruled to be a non-exertional limitation that does not substantially erode the occupational base.

> A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exist[s] at all exertional levels.

SSR 85-15. Similarly, the Commissioner has also ruled that unskilled work does not require the ability to understand, carry out, and remember more than "simple instructions." SSR 85-15.

However, the Commissioner has also ruled with respect to sedentary work:

> Whether the individual will be able to make an adjustment to other work requires adjudicative judgment regarding factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base; i.e., the impact of the limitations or restrictions on the number of sedentary unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education, and work experience, including any transferable skills or education providing for direct entry into skilled work. Where there

> is *more than a slight impact* on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, *the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country.*

SSR 96-9p. Logically, the same would be true for light work. If the non-exertional impairment has "more than a slight impact" upon the ability of the claimant to perform a full range of light work, the adjudicator must "cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country." To fulfill this responsibility, it is possible for the ALJ to "consult various authoritative written resources, such as the DOT, the SCO, the Occupational Handbook, or County Business Patterns." SSR 96-9p. Alternatively, the ALJ may call a vocational expert.

In summary, the law governing when the "grids" may be used is not entirely clear. It is recommended that the court follow the precedent set by Marbury v. Sullivan and remand this case for vocational testimony. Welch v. Bowen, 854 F.2d 436, 439-440 (11th Cir. 1988) (where the grids are not appropriate, and the Administrative Law Judge has not made specific findings as to the availability of particular jobs that exist in substantial numbers in the national economy which the Plaintiff can do despite his limitations, the proper course is for the court to remand for such factfinding.); Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985) ("The preferred method of demonstrating job availability when the grids are not controlling is through expert vocational testimony.").

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and were based upon substantial evidence in the record as to the determination of Plaintiff's residual functional capacity and that determination should be affirmed.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed, however, solely to remand for vocational evidence.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** with respect to the determination of Plaintiff's residual functional capacity, but **REVERSED and REMANDED** solely to obtain vocational evidence.

**IN CHAMBERS** at Tallahassee, Florida, on August 28, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**